LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
Fax: (212) 962-5037
anthonycecutti@gmail.com

January 2, 2024

**Via ECF & E-Mail**
The Honorable Katherine Polk Failla
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

## SENTENCING MEMORANDUM

### Re: *United States v. Davon Hawkins*, 21 Cr. 414 (KPF)

Dear Judge Failla:

"Now my brother always tells me that I am strong for staying away from people's negative energy but I know he is strong also for still being a good person [and] son despite the negative energy around him." – Dwonna Johnson, Davon's younger sister.

"Through the years he had [two] children, a son that is currently 18 and daughter that is 11…he is a very active parents in their lives… I am very proud of the way he turned [out], the fact being that he had no father growing up." – Taisha Hawkins, Davon's cousin.

"Davon is so many amazing things…[but] [h]e is not a drug dealer, he is not a criminal, he is not a bad guy, he is not someone who uses guns, and he is not violent. He is a father who was trying his best to provide for his children. He is a man with a family to take care of, but no one to take care of him. He is someone who always puts others first, despite no one ever doing that for him." – Alexis Colleen, Davon's girlfriend.

"I am a dedicated and hardworking man. I contribute to society, pay taxes and give back to my community. Every single day, I think about ways to be a better man and create a better future for my children." – Davon Hawkins.

We hope that this submission, along with the attached exhibits,[1] gives context to the

---

[1] Attached as Exhibit "A" is a letter from Davon to the Court. Attached as Exhibit "B" are letters from Davon's family and friends.

offenses he committed; offenses that are tied to the various traumas that Davon Hawkins has suffered and which have led to this moment. Davon is an individual, and to understand him and his life experience, he must also be viewed within the greater context of his complex family trauma and the longstanding systemic traumas suffered by Black people, and in particular, Black men in America. Davon has struggled with significant adversities throughout his life. Nonetheless, he is never one to blame his mistakes on others. He engages in honest efforts to hold himself accountable, through self-reflection, productive living and being present in every manner with his son and daughter. Taking into consideration all the § 3553(a) factors, we believe that a sentence of the mandatory minimum - 60 months' incarceration, is "sufficient, but not greater than necessary," in this case, for Davon Hawkins.

## I.    Who is Davon Hawkins?

A child should laugh. A child's earliest memories should be of happiness, warmth and love. There was not a lot of laughter in Davon's home growing up. At only 3 years old, in 1987, his father was stabbed to death. His mother, suffering from crack addiction, lost custody of him, following a report made to the Administration for Children's Services. Until about 9 years old, Davon was raised by his great grandmother. They stood in line at local pantries for groceries and made do with secondhand clothes. Davon's mother eventually regained custody, and except for a brief relapse, his mother ceased drug use. However, she drank regularly, and subjected Davon to frequent physical, verbal and emotional abuse. On some occasions, he called the police. On others, he ran away from home. Today, Davon reflects about the intergenerational trauma that not only affected affect him, but his mother. She never knew how to love him because no one ever loved her. Though Davon believes his relationship with his mother made him a stronger man, he acknowledges how painful it still is.

Davon never had a male role model or father figure around during his formative years. Courts have acknowledged that the "[l]ack of male parental guidance is a known, significant contributor to crime."[2] Studies confirm that "adolescent boys engage in more delinquent behavior if there is no father figure in their lives."[3] Moreover, "the strong link between adolescent family structure and delinquent behavior is not accounted for by the income differentials associated with fathers' absence…[T]he presence of a father figure during adolescence is likely to have protective effects, particularly for males, in both adolescence and young adulthood."[4] Research shows that "[f]athers also increase the degree of adult supervision in the household, which may lead to a direct reduction in delinquent behavior…[and] growing up in a single parent household is associated with increased risk taking[.]"[5] "Father absence may also increase associations with delinquent peers."[6] In sum, "boys engage in more delinquent behavior if there is no father figure in their lives."[7]

---

[2] *U.S. v. Bannister*, 786 F. Supp. 2d 617, 642 (E.D.N.Y. 2011).

[3] Deborah A. Cobb-Clark & Erdal Tekin, *Fathers and Youths' Delinquent Behavior*, 12 REV. OF ECON. OF THE HOUSEHOLD 327, 327 (2013).

[4] *Id.*

[5] *Id.* at 330.

[6] Cynthia C. Harper and Sara S. McLanahan, *Father Absence and Youth Incarceration*, 14 J. OF RESEARCH ON ADOLESCENCE, 369, 372 (2004).

[7] Cobb-Clark & Tekin, *supra* note 134, at 355.

When Davon was still a preteen, he moved away from the toxic environment at his mother's apartment, deciding to live instead with two older drug dealers in the nearby Jefferson Houses.  He was exposed to gang activity, drug use and sale, and brutal acts of violence.  His new "roommates" physically harmed him, and on one occasion, to the point of near death.  By the time Davon was 13, he was selling weed in the streets.  By 14, he was selling hard drugs like it was his full-time job.  The first time he was incarcerated was at around 15, at the Spofford Juvenile Detention Center.

The now notorious facility was an intake facility for minors and held an average of 289 minors at a time.[8]  Ninety-five percent of its detainees were African American or Latino, and fifty-four percent came from the same 15 low-income neighborhoods.[9]  In *Schall v. Martin*,[10] the United States Supreme Court described Spofford as "indistinguishable from a prison" and that the "pretrial detention of a juvenile … gives rise to injuries comparable to those associated with imprisonment of an adult. In both situations, the detainee suffers stigmatization and severe limitation of his freedom of movement."  Spofford was subject to numerous studies, which cited the dangers and awful conditions.[11] Suicide attempts were not uncommon at Spofford.  Violence was rampant.  It was unsanitary as described by a 1997 Daily News report that the facility's dining hall was "overrun by roaches that invade the food" and "crawling with rats."  It was decorated with lead-based paint and characterized by overcrowding, barred windows, poorly lit hallways, and broken toilets and showers.  It was oppressive and cold.  Beginning in the 1990s, community groups, such as the Correctional Association of New York, worked to close Spofford.  In 2011, Spofford was shut down by the city for its poor and dangerous conditions.

Davon spent approximately three excruciating and life-altering months at Spofford, before being released to an alternative to detention program in 1999.

After Spofford, Davon returned to living in poverty with his mother.  He briefly attended the Art and Design High School in Midtown East, before dropping out due to the shame and embarrassment he felt, falling behind other students academically.  At around 20, Davon had his first child, Davon Jr.  Though his relationship with Davon Jr.'s mother started off well, her substance abuse and mental health issues led to her briefly losing custody of Davon Jr. and her and Davon splitting up.  Davon had a 13-year relationship with the mother of his second child, Isabella.   Needing to support his children, Davin pursued education and employment opportunities.  Between 2016 and 2018, Davon completed courses in plumbing, carpentry and electrical repair through Apex Technical School in Long Island City.  He also completed a 40-hour OSHA course, as well as a 10-hour construction safety course.  Between 2015 and 2020, Davon worked as a plumber and laborer.  Since 2020, he has had steady, gainful employment as both a construction laborer and sprinkler mechanic at various companies.

---

[8] Jonathan Marty, "The Story of the Bronx's Spofford Juvenile Detention Center," Urban Memos at New York University, May 23, 2018, *available at* https://urbandemos.nyu.edu/2018/05/23/the-story-of-the-bronxs-spofford-juvenile-detention-center/.

[9] *Id.*

[10] 467 U.S. 253, 291 (1984).

[11] *See, e. g.,* Citizens' Committee for Children of New York, Inc., *Juvenile Detention Problems in New York City* 3-4 (1970); J. Stone, R. Ruskin, & D. Goff, *An Inquiry into the Juvenile Centers Operated by the Office of Probation* 25-27, 52-54, 79-80 (1971).

Davon has experienced a host of traumas, beginning at his birth. Many of those traumas are experienced by others in his community—being born to a single mother, having an unstable and abusive home environment, and being exposed to criminal activity at a young age. Davon was born into a life of poverty, violence, drug use, discrimination, and racism. But Davon is breaking the cycle with his children. All he hoped, as soon as he was old enough to hope, was that his kids would have a better go at life than he did. Davon has not always made it easy on them, but he is trying. Davon's son Davon Jr. is now 19 years old. His daughter Isabella is 10. Davon shared, "When I had my son at 20, I thought I was going to die before my son turned three, just like my dad did. But something clicked. I won already. I'm a good father. It's redemption now," said Davon. Davon's children have given him *everything* to live for. There is no question that he is a positive influence in their lives. His family and friends can attest to that. Not only does he have extremely difficult yet rich life experiences from which he can share a lifetime of advice, he understands that his presence and love will take his children far in life. Davon is fostering an environment of protective factors for his children, in which they can learn and blossom in a way he was never given the opportunity to.




 

## II.     Procedural Background

On July 7, 2021, Davon was arrested, brought to the Southern District of New York for his initial appearance, and released on bail.  On June 7, 2023, he pled guilty to participating in a narcotics conspiracy, in violation of 21 U.S.C. § 841(b)(1)(C) , a lesser-included offense of Count 1, and the use and possession of a firearm during and in relation to a drug-trafficking crime, Count 2, in violation of 18 U.S.C. § 924(c)(1)(A)(i), pursuant to a written plea agreement, dated February 22, 2023.  With a base offense level of 21 and Criminal History Category of I, and the mandatory and consecutive 60-month term to be imposed on Count 2, the stipulated Guidelines range is 97 to 106 months' imprisonment.

## III.     Offense Conduct and Relative Culpability

After being laid off from work and experiencing financial pressures, from May 2019 through February 2020, Davon sold cocaine inside and in the vicinity of 1830 Lexington Avenue, one of the buildings that make up the public housing developments, the Johnson Houses.  On two occasions in June 2019, he participated in controlled transactions with undercovers. Though Davon did possess a firearm in his home and stored it near the cocaine he sold and money he earned.  He never used it and kept it for the purposes of protection.  Davon did not participate in drug sales following his arrest by the New York Police Department ("NYPD"), for the same conduct, in February 2020.[12]  Nor did he engage in any further criminal activity following his February 2020 arrest.

The conspiracy here lasted from approximately May 2019 through February 2022—two years longer than Davon's participation.  In Government sentencing submissions filed in this case so far, it has represented that, in its view, each member of the conspiracy falls into one of three

---

[12] In the course of this arrest, the firearm was seized during a search of his home.

"bands" of culpability.  The third and least culpable including Alan Vittar, Lakeshia Garnett and Daquan Garnett.  The second including Lucious Garnett and Sadane Parsons.  And the first most culpable including Kwame Garnett, Isaiah Smith, Anthony Smith and Davon Hawkins.

After a thorough review of those submissions, it is evident that the Government slots Davon in the band of most culpable, simply because a firearm was found at his residence.  Though the unlawful possession of a firearm is indeed serious, Davon did not use or carry the gun when selling drugs. Even taking into account the gun, we do not believe Davon's conduct comes close in relative culpability to others in the first band.   In fact, we believe his limited role in the conspiracy, in addition to his lack of criminal history, place him firmly in the band of *least* culpable defendants.[13]

To illustrate, Kwame Garnett was sentenced to 110 months.  The Government requested a Guidelines sentence between 144 and 164 months' imprisonment. ECF No. 207.  At Mr. Garnett's residence, 50 cartridges of ammunition, a firearm, dozens of retail units of coke and fentanyl were found. *Id.*  There were hundreds of hours of surveillance suggesting Kwame sold every day from June 2019 through February 2022. *Id*.  Mr. Garnett also has three prior felony convictions and engaged in gunpoint robberies at the Johnson Houses. *Id.*  For Anthony Smith, who is awaiting sentencing, the Government has requested a Guidelines sentence within the range of 151 to 188 months' imprisonment. ECF No. 303.  Like Mr. Garnett, Mr. Smith engaged in daily sales for the entirety of the conspiracy period. *Id.*  He has a history of violent crime and controlled substance offenses ranging from 1998 until 2021, some for which he served substantial prison sentences. *Id.*  The Government also represented that Mr. Smith "openly and notoriously" held himself out to be a member of the Bloods at the Johnson Houses. *Id.*  Davon does come close in level of participation in the instant offense or criminal history to either Mr. Garnett or Mr. Smith.

Turning to the second band of most culpable defendants, Lucious Garnett participated in regular drug sales in both 2020 and 2021. ECF No. 283.  He has 15 prior criminal convictions, including 10 felonies: all but two involving the possession or distribution of controlled substances. *Id.*  He served substantial prison sentences on multiple occasions in the 1990s, 2000s and 2010s. *Id.*  The Government requested a significant incarceratory sentence within the range of 57 to 188 months' imprisonment, and this Court sentenced him to 48 months. *Id.*  Sadane Parsons was also a regular participant for the whole conspiracy period. *Id.*  He also has an extensive criminal history, having been convicted of controlled substance offenses, assaults and parole violations from 1999 through 2021. *Id.*  For Mr. Parsons, the Government requested a sentence between 77 to 188 months' imprisonment. *Id.*  This Court sentenced him to 86 months. Davon does not come close to either, in level of participation in the instant offense or criminal history.

---

[13] This is further supported by the Sentencing Guidelines ranges calculated by the Court for the least culpable defendants, which are as follows: Lakeshia Garnett – 37 to 46 months; Alan Vittar – 37 to 46 months; and Daquan Garnett – 41 to 51 months.  But for Davon's firearms offense, his Sentencing Guidelines range would be 37 to 46 months, on par with the least culpable defendants and nowhere near the Sentencing Guidelines ranges for the most culpable defendants, Kwame Garnett (144 to 164 months) and Anthony Smith (151 to 188 months) or the second most culpable defendants, Lucious Garnett (57 to 188 months) and Sadane Parsons (77 to 188 months).

Davon is much more similar to Lakeshia Garnett, Alan Vittar and Daquan Garnett. Ms. Garnett regularly sold drugs at the Johnson Houses in 2021 and participated in or was present for six controlled buys. ECF No. 316. Mr. Daquan Garnett participated in the conspiracy from 2019 and 2021 and has two past convictions from 2015. ECF No. 250. Mr. Vittar also participated from 2019 through 2021. ECF No. 288. Davon sold cocaine between May 2019 and February 2020. That is approximately 9 months. Davon did not sell drugs full-time. He was in the streets, in between shifts at his part-time mechanic and plumbing jobs. The conspiracy lasted for two additional years without Davon, who was neither a leader nor critical member to the success of the drug operation. He has one past drug conviction stemming from conduct in 2008, for which he engaged in a substance abuse treatment program, as an alternative to incarceration. He has never been affiliated with a gang. He does not live at the Johnson Houses or maintain associations at the Johnson Houses. And, he has never used a gun or participated in a violent crime. These facts suggest that Davon better fits in the least culpable band of defendants here and should be sentenced accordingly.[14]

## IV.    Sentencing Guidelines Analysis

After weighing the § 3553(a) factors, we believe that in this case, for Davon Hawkins, a sentence of 60 months is appropriate. The Guidelines grossly overstate his culpability, and the Court should, therefore, rely more heavily on the § 3553(a) factors. As such, a sentence of 60 months is "sufficient, but not greater than necessary," to serve the purposes of sentencing. After conducting a thorough presentence investigation, the Probation Department ("Probation") concluded that a "modest sentence" was appropriate. PSR at 37. Probation recommended a sentence of time served on the drug offense, to be followed by the mandatory and consecutive 60-month sentence on the firearms offense, for a total of 60 months. *Id.* Noting that this would be Davon's first custodial sentence to date, Probation's cites to several and significant mitigating factors in Davon's case, including his tumultuous childhood, time in the foster system, physical abuse, sexual abuse, witnessing extreme acts of violence, poverty and his suitability for future community-based supervision. *Id.* at 36-37. Notably, Probation does not suggest in any way that Davon is of the more culpable defendants in this case.

Rather than embracing the sentencing philosophy espoused and articulated by Congress in § 3553(a), sentencing courts are vulnerable to allowing the Guidelines to be a gravitational pull on the ultimate sentence. This has been described by academic scholars as the "anchoring effect."[15] The "anchoring effect" is recognized by psychologists as a cognitive shortcut that has

---

[14] The Court granted downward variances for all and imposed sentences of time served for both Ms. Garnett and Mr. Daquan Garnett, and 18 months for Mr. Vittar.

[15] *See* Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw,* 104 J. Crim. L. & Criminology 101, 132 (2014) (*citing United States v. Newhouse*, 919 F. Supp. 2d 955, 958 n.1 (N.D. Iowa 2013) (Bennett, J.). "Comprehensive data from the USSC establishes that the [post-Booker/Gall] discretion has, for the most part, had a surprisingly limited impact on federal sentencing. This is due primarily to the robust anchoring impact of first computing the advisory Guideline range before considering the other non-numerical § 3553(a) sentencing factors." *Id.* at 533-534. *See also*, *United States v. Ingram*, 721 F.3d 35, 40 (2d Cir. 2013) (Calabresi, J., concurring) (discussing how "anchoring effects" influence judgments and noting that the court "cannot be confident that judges who begin" at a higher guideline range "would end up reaching the same 'appropriate' sentence they would have reached" if they started

a strong tendency to undermine judgments in making difficult and complex decisions. Through an earlier disclosed number, the "anchor," the judgment of a decision-maker is influenced. Although *Booker* granted judges great discretion,[16] the length and severity of sentences of federal sentences, has not changed.  This is because judges' sentences are often "anchored" by the particular Guidelines Range in a case.  Judge Rakoff described the phenomenon of the "anchoring effect" of the Guidelines as follows: "[T]he very first thing a judge is still required to do at sentencing is to calculate the Guideline range, and that creates a kind of psychological presumption from which most judges are hesitant to deviate too far."[17]

Once appreciative and mindful of the "anchoring" effect of the Guidelines Range, a sentencing court is best able to engage in individualized sentencing and consider all mitigating information.  This conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[18]  In *Pepper*, the Supreme Court cited § 3661 as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant.'"[19]  And as further stated by the Supreme Court in *Pepper*, sentencing judges must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."[20]  Lastly, "[w]hile there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind,' and a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."[21]

As Your Honor well knows, every sentencing presents the Court with a unique set of individual circumstances which must be carefully and thoughtfully considered.  A vital goal of

---

from a lower guideline range). *Molina-Martinez v. United States*, 136 S.Ct. 1338, 1353 n. 6, (2016) (Alito, J concurring in part) (Noting the "anchoring" effect of Guidelines).

[16] *See United States v. Booker*, 543 U.S. 220 (2005).

[17] Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent'g 6, 8 (Oct. 1, 2013).

[18] Likewise, in 21 U.S.C. § 850, which specifically pertains to narcotics offenses and their penalties, Congress further determined that "... no limitation should be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence ..." 21 U.S.C. § 850. *See also United States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990).

[19] *Pepper v. United States,* 562 U.S. 476,488 (2011), *quoting Wasman v. United States*, 468 U.S. 559, 564 (1984); *see also Gall*, 552 U.S. 38, 50 (2007) (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); See also United States v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (requiring district courts to conduct an "independent review of the sentencing factors" in all cases); *Rita*, 551 U.S. at 367 (noting that the Guidelines are "truly advisory"); *Gall*, 552 U.S. at 50 (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *United States v. Johnson*, 567 F.3d 40, 50-51 (2d Cir. 2009) (same).

[20] *Id*. (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))

[21] *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

the criminal justice system is to balance deterrence and punishment against the destructive effects of incarceration, while meaningfully accounting for mitigating circumstances and an individual defendant's capacity for positive change.  Davon knows that he played a part in a harmful narcotics conspiracy—an offense that undoubtedly resulted in the use of dangerous, addictive drugs by many.  Though Davon only intended to sell cocaine and was not aware that co-conspirators were trafficking fentanyl specifically, he knew the risks involved in participating in this kind of drug operation, and he irresponsibly and recklessly agreed to participate.  As indicated by his statement during his plea proceeding, statements to Probation during his presentence interview and his letter to the Court, Davon understands and accepts that he must be held accountable for his actions.

## V.     Goals of Sentencing

Pursuant to Section 3553(a), the Court must consider the purposes of sentencing, specifically "just punishment," deterrence, incapacitation and rehabilitation, as they relate to Davon.  Assessment of these purposes is often conducted with the view toward the length of an individual's incarceration rather than the propriety of incarceration.  The purposes of sentencing should be examined through a "restorative justice" lens.  "Restorative justice" is a theory of justice that emphasizes repairing the harm caused by criminal behavior.  It does not excuse criminal conduct.  Rather, it seems to hold an individual offender accountable by meaningfully seeking to repair the harm caused, while allowing the offender to continue to change and engage in supportive activities.  *United States v. Cole*, 622 F. Supp. 2d 632, 637 (N.D. Ohio 2008).

Without question, the nature and the circumstances of Davon's offense are serious.  He participated in a drug conspiracy in which he sold cocaine.  He also possessed a firearm at his home, keeping it near the drugs he sold and money he earned.  But he played a limited role, and only during the time period of May 2019 until February 2020, despite the conspiracy spanning until February 2022.  There is simply no plausible argument that a sentence for Davon that is longer than the mandatory minimum furthers the goal of "just punishment."  A sentence of 60 months incarceration will exact a significant punishment on Davon.

Incapacitation is the simplest purpose of sentencing. It guarantees that a person is incapable of engaging in conduct harmful to others.  While there can be legitimate purpose for incapacitation for certain defendants, it does not apply here as Davon does not need to be incarcerated so that he is incapacitated.  Davon has one non-violent drug conviction related to conduct from 15 years ago.  This cannot be said of many of his co-defendants.  When Davon was 24 years old, he was arrested for a minor drug offense.  After pleading guilty in 2011, he was sentenced to 5 years' probation.  Until his arrest by the NYPD in February 2020, and subsequent incarceration at Rikers Island for approximately three weeks—for the same conduct as is relevant to the instant case—he had never been incarcerated before.[22]  Case after case observes that individuals like Davon, without an extensive criminal history, are less likely to reoffend.  A report

---

[22] We intend to request that the Bureau of Prisons give Davon credit, towards his federal sentence, the three weeks he was in New York Department of Corrections' custody at Rikers Island in early 2020, as that period of incarceration was not credited towards any state sentence and stemmed from the same conduct as the instant case.

by the United States Sentencing Commission also suggests that an individual's "[c]riminal history score and Criminal History Category are strong predictors of recidivism," and individuals like Davon are significantly less likely to recidivate than those with extensive criminal history.[23] Davon is not a danger.   Other protective factors like his supportive family, housing and employment opportunities provide further assurance that he will not reoffend.

In *United States v. Bannister*,[24] Judge Weinstein determined that specific deterrence is not accomplished by lengthy incarceration.   Unnecessary prison sentences aimed at specific deterrence promote higher rates of recidivism.   During such sentences, a person loses positive and constructive family and social supports, gains negative influences, and is precluded from educational, employment, and rehabilitative opportunities.   Prison is limited in efficacy.   Many of the defining features of incarceration are linked to negative health outcomes, including disconnection from family, loss of autonomy, lack of purpose, and unpredictability of surroundings.   Professor Craig Haney, an expert on the psychological effects of imprisonment and prison isolation explains, "At the very least, prison is painful, and incarcerated persons often suffer long-term consequences from having been subjected to pain, deprivation, and extremely atypical patterns and norms of living and interacting with others."[25]

Davon has not had any violations since his release on bail on February 4, 2021, nearly two years ago.[26]   Similarly, he has had no violations since March 2, 2023, when his bail conditions were modified to replace home detention with a curfew restriction.   The degree of supervision Davon will be under upon release will mean similar, involving drug-screening, regular visits with the Probation officer, and oversight of educational, mental health and employment activities.   This will be significant and constant surveillance.   It will curtail and limit his liberties, but it can still be conducive to Davon's long term success.   Regardless of the sentence imposed, Davon will reenter society one day and face hurdles as a result of this conviction, which courts have considered when determining punishment.[27]   Labeled a "felon," he will likely suffer restrictions

---

[23] *See* U.S. Sentencing Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, 6-7 (2017).

[24] *Bannister*, 786 F. Supp. 2d at 617.

[25] Quandt, Katie Rose and Alexi Jones. "Incarceration Can Cause Lasting Damage to Mental Health." Prison Policy Initiative. May 13, 2021. https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/.

[26] According to Pretrial Services ("Pretrial"), Davon has "adjusted well to supervision" and has not "incurred any violations." *See* PSR at ¶ 18.  Davon's only issue of non-compliance has been his marijuana use. Such non-compliance did not "rise to the level of a formal violation" as Pretrial determined that his marijuana use did not "appear to be affecting any other aspect of [his] life." *Id.*  Davon "continued to maintain gainful employment," did "not incur[] any new arrests," and did not "violate[] any other conditions as a result of the marijuana use."  Further, he began attending an outpatient substance abuse treatment program at Samaritan Village in June, 2023 to address his marijuana use.

[27] *See United States v. Nowak*, 2007 WL528194 (E.D. Wis. Feb 15, 2007) (imposing a probation sentence after finding that the court "can and should consider the collateral consequences in deciding the appropriate sentence"); *United States v. Wachowiak*, 412 F. Supp. 2d 958 (E.D. Wis. 2006) ("… the guidelines failed to account for the significant collateral consequences defendant suffered as a result of his conviction … [h]is future career as a teacher was ruined"); *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009); *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006). Additionally, in *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), the sentencing court, despite a Guidelines Range of 78 to 97 months, sentence the defendant to 20 months' imprisonment in part because the "conviction made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened

in broad ways that affect his financial, political and social rights.  These consequences are multi-generational and life-altering.  They permanently trap and disenfranchise convicted persons in a level of inferiority and inequality.  Additionally, a long period of incarceration contributes to a diminished sense of instability and safety, economic insecurity, social stigma, housing instability and lower quality living conditions, not just for Davon, but for those who depend on him—his children.  Our recommended sentence of 60 months, in addition to these collateral consequences, is a meaningful punishment by any measure.  It reflects society's designation of the instant offense as meritorious of punishment, promotes respect for the law, and provides "just punishment."

Systemic racism has impacted every part of Davon's life.  Many external forces played a role in determining his path—forces such as the legacy of slavery and oppression, racism, unequal opportunities and feeling less than.  Davon cannot change what he did in this case, but in considering his sentence, we hope the Court can appreciate the desperation and hopelessness that came with the decisions he made.

Davon is prepared to be sentenced.  He has been engaging in rehabilitative efforts since his arrest by the NYPD in February 2020 and plans to continue those during his period of incarceration.  As he shared with Probation, he wants to understand what in his life led him to this case.  Davon is open to discussing issues stemming from his childhood trauma, so that mistakes are not repeated.  He has been in an intensive substance abuse treatment program at Samaritan Village since June 2023, where he has voluntarily sought out mental health services.  He plans to do the same at his designated facility.  Davon has his GED, along with other educational and vocational skills.  His working full-time as a mechanic Fire Safety Sprinkler and walks with his son, who he got a job for at the same company, to work every day.  Davon supports both of his kids financially and spends a great deal of quality time with them, drawing, ice skating and watching movies.  Though the mandatory minimum sentence on Count 2 is significant, it would still allow Davon to return to the life he has built for himself while out, without extensive or needless delay.  Any more time would only deprive the community of a productive and law-abiding man, and further harm his loved ones.

"While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of 'the diverse frailties of humankind,' and a 'generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain.'"[28]  We believe that, in considering all of the sentencing factors under § 3553(a), a sentence that is right and just for Davon, is one that does not include a period of incarceration longer than 60 months.  Davon is committed to living the rest of his life without stepping foot in another criminal courtroom.

---

because the conviction itself already visits substantial punishment on the defendant." The Second Circuit affirmed, reasoning that the sentencing court's analysis was "required by section 3553(a)," and stated: "It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Id.* at 141-142.

[28] *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

## VI.    Conclusion

In Davon's letter to the Court, he wrote: "I am not a man who makes excuses.  I am here today because of poor decision I made – decisions I very much regret… Despite my prior poor decisions, and everything I have been through, I ask you for mercy when considering my sentence… I want to end where I started, which is with my children."[29]

A person's rehabilitation efforts provide "the most up-to-date picture of [his] 'history and characteristics.'"[30]  A court's duty is always to sentence the defendant as he stands before the court on the day of sentencing.[31]  Davon is a good man.  He is a smart, productive and compassionate man.  His conduct in this case is not who he is, and that is evidenced by his lack of criminal history.  Since his arrest, he has made intentional decisions in the effort to repay his family and the community for harm he has caused.  Nothing will get in the way of him being a guiding light in his children's lives.  When he is released, we have no doubt that he will somehow be an even better man than he is now.

For these reasons, we respectfully urge the Court to impose the mandatory minimum sentence on Count 2—60 months' incarceration—and time served on Count 1, as such a sentence would be "sufficient, but not greater than necessary," pursuant to 18 U.S.C. § 3553(a), for Davon Hawkins.

Respectfully submitted,

/s/

Anthony Cecutti, Esq.
Kestine M. Thiele, Esq.

---

[29] Exhibit A.
[30] *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000).
[31] *Id.*

# Exhibit "A"

July 28, 2023

Dear Judge Failla,

I am not a man who makes excuses.  I am here today because of poor decisions I made – decisions I very much regret.

I ask that you please take into consideration as you are deciding my sentence that I will be away from my kids.  They are the first and foremost in my life.  As a father, I am consistently involved in their lives.  I provide and motivate them.  Most importantly, I love them.  They will suffer while I am incarcerated and I will too.  I am also worried about being away from my mother and aunt as they both suffer from serious medical issues.  I do not want anything to happen to them while I am away.

I also am a dedicated and hardworking man.  I contribute to society, pay taxes and give back to my community.  Every single day, I think about ways to be a better man and create a better future for my children.

These last 3 years have been very hard, not knowing my fate.  It has felt like a dead-end with no light at the end of the tunnel.  But, I have not given up.  Everyday, I work and take care of my kids and family, to the best of my ability.

Despite my prior poor decisions, and everything I have been through, I ask you for mercy when considering my sentence.

When I am released, I will go back to work and continue to provide for my family and community.  My trade is in plumbing and I desire to obtain my Commercial Driver's License (CDL).  Further, I am currently enrolled in an outpatient drug program and want to also start my own non-profit so that I can teach kids trades, such as plumbing, construction, electric and carpentry.

I also want to thank my Pretrial Services officer and my lawyers, and to you, your Honor for the support and respect I have been given.  I also want to say that I am sorry to my children and family, friends and loved ones.

Finally, I want to end where I started, which is with my children.  I need to be home as soon as possible to protect my daughter and guide my son.  I believe children need their father and I want to be with them and care for them every step of the way.  So, I ask that you sentence me to the lowest term of prison that you believe is fair.

Your Honor, please take all of this into consideration as you make your decision.


Thank you,

Davon Hawkins

# Exhibit "B"

Dear Honorable Judge Failla

Thank you for taking the time to read this . I am Dwonna  Johnson  ( little sister by 3 years). I would like to think  that I know my brother Davon Hawkins  much better  then most , so I would like to share some moments I am most proud of my brother he as many are not is not perfection but is trying in many ways.

If I had to choose a word to describe him it would be Honest ,too Forgiving, Protective .
When we're younger we lived with our great grandmother  , my grandmother had to put my mother out because  she was leading a bad lifestyle  and my great grandmother at 80 years old fought for sole custody of me and brother .Myself at the age of 5 , my brother at t he age of 8 had conversation with a mediator who said we the children had a say on who we wanted to stay with , my brother and I had a pvt conversation I said" I wanted to go with mommy :and he said "He wanted to stay with grandma because she needs help.
I didn't see my brother much again until my mother and I got out the homeless shelter  and into a 2 bedroom apartment.. we weren't allowed to get a three bedroom  because my mom never got back custody of my brother but my grandmother  was getting older and allowed my mom to get my brother when he was 12.

We shared a room and made the best of it.
We were offered a transfer to a 3 bedroom apartment, but my mother didn't want to move.

I couldn't go anywhere without my brother, he was my protector as a child , still is in some ways . It settles my mind knowing my big brother is reachable.

 My brother at 14 made it into Art & Design high-school as he is a very talented  artist although it was a commute he went.

I remember when I was 12 and he had just turned 15 my brother found some illegal substances in my mother's possessions ,he threw it out . When my mother found out she kicked him out and when he stayed with a neighbor my mom threatened the neighbors saying she would call the cops even though my mom wouldn't let my brother back in . My mom for her reasons wanted him to be homeless,  he eventually ended up outside more often and I witnessed my mom calling the police making false reports,  due to these situations his spot at Art & Design was forfeited.

I witnessed my brother's joy taken and he was in pursuit of happiness and at that age I do not think he knew where to find it. My brother had a son when he was 16 and a daughter later at 24 he supported them the best way he knew how .

I am proud of my brother for trying  to do the best he could in terrible circumstances. I know he had choices. I also know some choices were between all bad options. Still choices had to be made, Even if he wasn't mentally prepared to make them he did.

When I was 15 I ran a away from the  anger my mother turned to me , and my brother knew where I was and came to check on me he didn't  want me where I was but he knew it wasn't safe for me at home and so my brother  walked me to the precinct where I told a detective  I didn't want to go home and I went to a group home ,my brother and I never moved back in with our mother.

Now my brother  always  tells me that I am strong for staying away from people's negative energy but I know he is strong  also for still  being a good person/  son despite the negative energy around him.

He grew from learning  from our Mother , then learning from the environment / society and now he has been able to grow himself learning from his unavoidable experience,  he is showing great tenacity to re-education himself . He has been working as a plumber for over 5 years . He is an active father in his kids' lives.He has aspirations that he can't aspire for if he is to be in jail and still I show him hairstyles I do for my daughter and he does his daughter's hair himself. His son is doing cement work with my brother  teaching the trade .

My brother has expressed to me that he doesn't want to take a plea deal , I do not think he was in his right mind when he agreed. As his sister, my brother confided in me, he thought that he would be arrested  within the week if he didn't take the deal.He was and still under alit if stress.

*Sincerely: Dwonna Johnson*

Honorable Katherine Polk Failla

United States District Judge

Southern District of New York

40 Foley Square

New York, NY 10007

Re: <u>United States v, Davon Hawkins,</u> 21 Cr. 414 (KPF)

Dear Your Honor

   My name is Taisha Hawkins, and I am writing this letter in hopes of getting my younger cousin Davon Hawkins some leniency on his sentence. I'm a 41-year-old mother of four children, three biological and one adopted back in 2004. Currently I am employed at the Department of Social Service, and I had my fair share of jobs from legal assistant to casework even operated NYC transit trains for a few years. But now I am back to being a caseworker near my house which I purchased back in 2019 I needed to get my children away from the city too much going on out there. And raising 2 boys and 2 girls out there was scary, this is why I currently don't watch the news, it's too much bad news for me.

   Me and my cousin Davon Hawkins grew up in small family which Included a great-grandmother who raised my mother his mother and another sister no man involved with neither of them. Davon spent half of his life living with my grandmother until his mother got herself together and that was around 13 to 15 when he moved into public housing with her due to my grandmother's ailing age which limited her to take care of him any longer. I lived in another public housing about 10 blocks down, so we were able to visit each other often since we were teenagers, and our parents rarely restricted us from going outside. They never even guided us on how to get a job, finish school and go to college. We had to learn all this our self from self-guidance. We didn't graduate high school but eventually obtained our High School Equivalency Diplomas. We tried some colleges, but college is not for everyone.

   Even though Davon did not finish college neither did I, he was able to complete a trade in plumbing and that is current career. Through the years he had 2 children a son that is currently 18 and daughter that is 11 which he a very active parent in their lives unlike some men out here. I am very proud of the way he turned, the fact being that he had no father growing up besides mine, which is also his godfather. My cousin has been living with my mother threw out the years and currently still stays there. She is not an easy person to live with but what parent Is. She had a stroke 2 years ago that affected half of her brain so currently she has a home attend taking care of her during the day on the weekdays because that is what is approved by the government's Medicaid program. Davon is the one that takes care of her during the nights and weekends. I cannot do it because I live upstate, and she refuses to live with me or go to a nursing home. I do take her some weekends if she agrees. And I appreciate the fact that my cousin is there just in case she has another stroke because the doctor told me that she had three, the last one was the big one.

We both have ailing mothers and I don't know if anything can happen when Davon goes away and for me to handle alone will be very devastating to me without the family support because like I stated we have a small family besides the children we created to expand it but as far the next generation of elders it's me and him. Davon has been on house arrest for the past 2 years it seems, but this has limited his ability to do anything with his children and my children together so we can create memories we never had. And as children get older it's harder to get them to go places with family due to them having their own social life. But during this time, he has been strong and made the best with his time working, having kids come to my mother's house and also going to see his not so nice mother and not getting into trouble.

   I do not agree with the decision the Davon made that put him in this predicament and I have always told him that and tried to show him the way of life he got the memo somewhat but not all the way we did change our future and make the best of it by getting an education and a job unlike our mother and actually being a part of our kids' lives. That's why I am asking for the sake of the kids our parents who are ageing that you please give my cousin some type of leniency the ankle monitor restricted him for a while and restricted us from family vacations and I would greatly appreciate if you can either lower sentence, eliminate put on probation something because time is limited and you never know what can happen in these coming years.


Sincerely

Taisha Hawkins

Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

### Re: <u>United States v. Davon Hawkins</u>, 21 Cr. 414 (KPF)

Dear Your Honor,

My name is Alexis Colleen, I use she/her pronouns, and I am a social worker and community organizer. I currently work at the Urban Outreach Center of NYC on the Upper East Side and recently obtained my Master of Social Work from CUNY Hunter College. I live in East Harlem and am currently working towards obtaining licensure so I can practice clinically in the state of New York.

Davon and I have been in a relationship since January of 2023. We met because we live in the same neighborhood, he is only four blocks up from me, and one day in mid-January I bumped into him as he was leaving the barbershop. We exchanged numbers, began seeing each other, and shortly thereafter began a relationship. It did not take long for me to fall in love, and we have been having discussions about our future and possibly marriage. I am confident that Davon Isiah Prince Hawkins is the love of my life, he is the one, and we are meant to be together.

I am smitten by Davon, not just because of how he acts towards me, but how he treats others as well.  For example, I have witnessed him be a fantastic father to both his children, help his elderly, sick mother immensely, and take care of his aunt who has health issues and struggles due to a previous stroke. I have seen him go out of his way for others, and he has especially gone above and beyond for me. I have some health issues of my own, and since I have been with Davon, I have had two surgeries, a biopsy, and an MRI, and he was there with me every step of the way and held my hand throughout. I also struggle with my mental health, and Davon has been the one person in my life to not leave me when I was dealing with intense suicidal ideation. That being said, I am worried about what is going to happen the next time I am going through a crisis or having an episode and I do not have him there to help me through the dark times.

Davon does so much for me and takes care of me in a way no one else ever has, not even my family, including cooking, bringing me coffee and breakfast in bed on weekend mornings so we can have our morning dates, buying groceries, helping me problem solve, doing my hair, teaching me how to box… I could go on. Most days Davon is the only thing I look forward to, and without him I genuinely do not think I will survive. Sometimes just being in his company calms me down, and if I am having an episode, I just need a hug from Davon, and it makes me feel better.

Davon is a lot of things, but what is most important to him is being a father. He loves his kids and would do absolutely anything for them, and I have seen this time and time again. He sits through children's movies and tea parties with his daughter, he teaches his son his trade (plumbing) and gives him life advice. He goes downtown to pick Bella up from school when she does not feel good, and he goes all the way to Pennsylvania with Trelly to make sure he is safe and secure. He also goes all the way to his mother's house to do work for free because she needs it, and he takes care of his aunt when she is not feeling well. He is a giver, a caretaker, a lover, a father, son, nephew, uncle, cousin, friend, and most importantly to me, a fiancé.

Davon is so many amazing things and possesses so many admirable qualities, but he is not what the prosecution is saying he is. He is not a drug dealer, he is not a criminal, he is not a bad guy, he is not someone who uses guns, and he is not violent. He is a father who was trying his best to provide for his children. He is a man with a family to take care of, but no one to take care of him. He is someone who always puts others first, despite no one ever doing that for him. His mother kicked him out at 14, his father was not in his life, and he had no role models but the guys in the streets. The police killed his dog, he watched everyone around him get shot or shoot someone, get stabbed or stab someone, get beaten or beat someone, arrested, violated, and profiled. He has immense trauma that has gone untreated for decades, and there was no one to teach him right from wrong. He had nowhere to go and babies to feed, could not get a job, could not complete his education, and had no choice but to return to what he knew from going up in order to make sure his children survived.

Davon Hawkins did not want to do the things he did but felt there was no other way because of how he is perceived by the world. He is a poor Black man from the projects, born to a single mother who was addicted to crack, who started selling drugs and fighting to survive at 14, with a criminal record and no education, he was not meant to thrive. The system was stacked against him since the day he was born. No one was ever going to give him a chance, and he knew that, which is why he did what was necessary to survive and take care of those around him. He should not be punished simply because he was never given a fair chance in the first place.

Therefore, I ask the court to impose the lowest and most lenient sentence possible, given that Davon is only here because this very same system failed him over and over again. Time and time again, no one ever stepped in to help, but now is the time to do that. Do not take Davon away from his children longer than necessary, they need him, and they are heartbroken at the situation.

I implore you to take into account Davon's history and personal experiences, his mental health struggles, his trauma and depression, his substance use issues, and his anxiety. I say this not as a social worker, but as his partner who can see it in him daily, where he is hurt or struggling but keeps pushing on because he has to be strong for his children, mother, me, etc. He never lets himself feel, and that is how he ended up here, because he had to be numb due to his environment and surroundings, the circumstances he grew up in, and the lack of love he experienced as a child.

Your Honor, please have empathy, compassion, understanding, and mercy when you decide what happens to Davon. These are all values that he has never experienced before, and no one in his life, whether it be family, law enforcement, the criminal legal system, or people he grew up with, ever treated him with care, respect, and love. Please change that and be the one to break the cycle. Please see him as a human being, a loving father, a doting fiancé, an amazing son, a helpful nephew, a hard worker, a caring person. I ask you to take a holistic approach as you are making your decision and understand how many lives you are affecting when you hand down your ruling. His future is in your hands, but so is my life. Thank you.

Respectfully,

Alexis Colleen, MSW